

1998 Decisions

12-30-1998

# Taj Mahal Travel v. Delta Airlines

Precedential or Non-Precedential:

Docket 97-5652

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Taj Mahal Travel v. Delta Airlines" (1998). *1998 Decisions.* Paper 289.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/289

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5652

TAJ MAHAL TRAVEL, INC.,
        Appellant

v.

DELTA AIRLINES INC.; AIR CANADA;
AIRLINES REPORTING CORPORATION,
        Appellees

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 97-cv-00988)

Argued September 24, 1998

Before: BECKER, Chief Judge, WEIS, and GARTH,
Circuit Judges.

Filed: December 30, 1998

        Gianni Donati, Esquire (ARGUED)
        230 Nassau Street
        Princeton, New Jersey 08542

        Attorney for Appellant

Francis P. Newell, Esquire
(ARGUED)
Montgomery, McCracken, Walker &
Rhoads, LLP
123 S. Broad Street
Philadelphia, Pennsylvania 19109

Stacy A. Fols, Esquire
Montgomery, McCracken, Walker &
Rhoads, LLP
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, New Jersey 08002

Attorneys for Appellees

OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal, we determine that the defendant airline's form letter advising a number of passengers that their tickets are considered to be stolen may be defamatory to the plaintiff travel agency that sold the tickets. We also conclude that the preemption provision of the Airline Deregulation Act does not apply to this state tort claim. Accordingly, we will reverse the District Court's dismissal of the plaintiff's defamation claims.

Taj Mahal Travel, Inc. was a travel agency in Princeton, New Jersey, specializing in furnishing airline tickets to persons traveling to India. Some of these tickets were purchased from an authorized agent for Delta Airlines by Taj Mahal which, in turn, sold them to its patrons. On a number of occasions in 1996 when these tickets were presented at the airport in India for the return flight to the United States, Delta refused to honor them. The travelers were required to purchase new tickets and were given the following explanatory form letter:

"Dear Delta Customer:

We regretfully must inform you that the ticket presented has been reported as a stolen airline ticket.

It is unfortunate that you have purchased one of these tickets. While we empathize with your predicament, we cannot honor this ticket for transportation because Delta has not yet received the money you paid. To assist you in this difficult situation, we will sell you a new ticket, honoring the fare indicated in you [sic] flight reservation record and waiving any advance purchase requirements.

It is necessary to retain your ticket in order to assist with the ongoing "law enforcement investigation; however, this letter will serve as your receipt for ticket number [_____]. If you purchased your ticket from an authorized Delta travel agency, please complete the attached affidavit and forward it to Delta Air Lines, Inc. for a refund. If you purchased the ticket from someone not authorized by Delta to sell its tickets, you should contact the individual from whom you purchased the ticket, as Delta has not received any payment for this ticket.

If this ticket has been issued by a travel agent and you have further questions, you may contact the Agency Audit and Fraud Prevention, Airline Reporting Corporation at (713) 816-8134."

In a complaint against Delta and others filed in New Jersey state court, Taj Mahal alleged that the letter was defamatory, and caused its patrons not only to demand reimbursement, but also to cease doing business with the agency. Because of the injury to its reputation and trade, Taj Mahal sought compensatory and punitive damages in counts asserting defamation and state RICO claims. Defendants removed the case to the United States District Court for the District of New Jersey under diversity jurisdiction.[1]

_____

1. Defendant Air Canada was dismissed because of improper service of process. Other counts, including a state RICO claim and a claim alleging a scheme to shift airline costs to agents such as Taj Mahal and to the traveling public, were also dismissed. Plaintiff has not appealed those orders. The defamation counts at issue in this appeal were asserted only against Delta.

Holding that the letter could not reasonably be read to have a defamatory meaning, the District Court entered judgment on the pleadings for Delta. Fed. R. Civ. P. 12(c). The Court further held that even if the letter was found to be defamatory, Taj Mahal failed to show that the statements were " `of and concerning' the plaintiff." According to the Court, "the letter does not mention the plaintiff by name . . . . and did not specify by name or implication any particular person or entity." Rather, it "refers to any number of travel agents without specific reference to any particular one."

At a later date, relying on the preemption provisions of the Airline Deregulation Act, 49 U.S.C. S 41713(b)(1) (formerly at 49 U.S.C. S 1305(a)(1)), the District Court entered judgment against the plaintiff on a state RICO count.

Plaintiff has appealed the ruling on the defamation counts, contending that a reasonable reader could understand the letters to accuse Taj Mahal of selling tickets for which it had not paid. Moreover, it also asserts that actions for defamation are not preempted by the Airline Deregulation Act.

I.

Our review of the District Court's dismissal of a complaint under Fed. R. Civ. P. 12(c) is plenary. See Hayes v. Community Gen. Osteopathic Hosp., 940 F.2d 54, 56 (3d Cir. 1991). We must accept as true the allegations in the complaint, and draw all reasonable factual inferences in Taj Mahal's favor. See Turbe v. Government of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991). The District Court's judgment may be affirmed only if no relief can be granted under any set of facts that could be proved. See id.

In this diversity action, the plaintiff's cause of action for defamation is governed by the law of New Jersey. To state a claim, the plaintiff must prove: (1) that the defendant made a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) fault. See Feggans v. Billington, 677 A.2d 771, 775 (N.J. Super. Ct.

4

App. Div. 1996); see also Restatement (Second) of Torts S 558 (1976). Repeating a defamatory statement is itself defamation, Kotlikoff v. Community News, 444 A.2d 1086, 1088 n.1 (N.J. 1982), and a printed defamation is libel. See Restatement (Second) of Torts S 568 (1976).

"A defamatory statement is one that is false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence" of others. Romaine v. Kallinger, 537 A.2d 284, 287 (N.J. 1988) (internal quotation marks removed). A court must look to the "fair and natural meaning which will be given it by reasonable persons of ordinary intelligence" and examine the publication as a whole and in context. Id. at 288. A court may determine as a matter of law whether a statement is defamatory, assuming that it is capable of only one meaning. When the words are capable of either a defamatory or non-defamatory construction, however, the trier of fact must determine their meaning. See id. False written attributions of criminality are defamatory as a matter of law. See id. A theft of over $500 is a crime of the third degree in New Jersey. See N.J.S.A. S 2C:20-2(b)(2)(a).

Not only must the statement be defamatory, it must also be "of and concerning" the plaintiff. A defamatory statement need not explicitly name a plaintiff, so long as it was understood to refer to it by at least one third party: " `[i]f the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff.' " Gnapinsky v. Goldyn, 128 A.2d 697, 703 (N.J. 1957) (quoting Restatement of Torts S 564 cmt. b (1938)); see also Dijkstra v. Westerink, 401 A.2d 1118, 1120 (N.J. Super. Ct. App. Div. 1979) ("It is enough that there is such reference to him that those who read or hear the libel reasonably understand the plaintiff to be the person intended."); Mick v. American Dental Assoc., 139 A.2d 570, 582 (N.J. Super. Ct. App. Div. 1958) ("When defamatory words are directed at a group or class of persons rather than an individual, the plaintiff must show that he is a member of the defamed class and must establish some reasonable application of the words to himself.").

Thus, we analyze Delta's form letter by placing ourselves in the position of the expected reader, a ticket-purchasing patron of Taj Mahal. The letter states that "the ticket presented has been reported as . . . stolen," "[i]t is unfortunate that you have purchased one of these tickets," and "Delta has not yet received the money you paid." The letter thus links theft, a criminal offense, to the ticket received from Taj Mahal. The "has been reported" phraseology does not shield Delta because republication of defamatory matter is actionable regardless of the republication's accuracy. See Kotlikoff, 444 A.2d at 1088 n.1 ("It is a well settled rule of defamation law that one who republishes libelous matter is subject to liability as if he had published it originally, even though he attributes the libelous statements to the original publisher."); Rogers v. Courier Post Co., 66 A.2d 869, 873 (N.J. 1949); see also Restatement (Second) of Torts S 578.

In addition, the letter provides: "[i]t is necessary to retain your ticket in order to assist with the ongoing law enforcement investigation . . . ." Clearly, this emphasizes to the reader that some type of criminal misappropriation is involved. The text, therefore, permits an inference of defamatory meaning.

The question remains whether the letter would lead a reasonable reader to conclude that Taj Mahal is in some way connected with the purported illegality. We believe that it could. To begin with, the patron knows that he paid Taj Mahal. The Delta letter notes the reason for refusal to "honor this ticket for transportation [is] because Delta has not yet received the money you paid." Yet Taj Mahal is the only entity with which the patron had contact.

It is reasonable to infer that if Delta did not receive that money, then Taj Mahal did not transmit the payment. The final sentence of the letter strengthens this assumption: "If this ticket has been issued by a travel agent and you have further questions, you may contact the Agency Audit and Fraud Prevention, Airline Reporting Corporation . . . ." The word "fraud" smacks of criminality.

To defeat the colloquium, Delta contends that the letter could refer to any number of travel agents or other

intermediaries. The reader, however, did not buy his ticket from any number of travel agents; he bought it from Taj Mahal. The imputation of fraud and dishonesty focuses on the agency from whom the passenger purchased the ticket. Moreover, the average airline passenger is unlikely to know of any intermediaries between the travel agency and the airline. Delta concedes as much in its brief: "it is highly unlikely that the travelers who purchased tickets from Taj Mahal had any idea when they received the letter at issue that Taj Mahal was actually `someone not authorized by Delta to sell its tickets.' " (Appellee's Brief at 11 n.5).2

A fact-finder might conceivably adopt Delta's contention that the letter did not point to Taj Mahal. However, at this stage of the litigation, this ambiguity may not be resolved against the plaintiff. We conclude, therefore, that the letter is capable of defamatory meaning directed at Taj Mahal and that the District Court erred in entering judgment for the defendant.

II.

After entering judgment for Delta on the defamation counts, the District Court ruled that Taj Mahal's state RICO claim was preempted by the Airline Deregulation Act. Plaintiff has not appealed the RICO dismissal and, thus, it is not before us. Taj Mahal argues that Delta waived the preemption defense by not raising it until it moved to dismiss the state RICO claim, which occurred after the District Court had already dismissed the defamation counts. However, the preemption defense is a pure issue of law applicable to the defamation counts as well, and could be dispositive. See Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993). Since the parties have briefed and argued preemption on appeal, we will consider it.

Interstate, but not intrastate, airline travel was heavily

_____

2. In their briefs, the parties dispute the impact that potential intermediaries, with or without agent-principal relationships to Delta, might have on the plaintiff's defamation claims. Because we conclude that the reasonable reader would be unaware of such intermediaries, their existence is irrelevant to the disposition of this appeal.

regulated by the federal government before 1978. See Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 (codified at 49 U.S.C. S 1301 et seq. (repealed)). In that year, Congress concluded that, generally, open competition among airlines, particularly with respect to rates and services (e.g., direct or nonstop flights, or locations to which planes would fly, etc.) would benefit consumers and the economy. See 49 U.S.C. S 1302 (recodified as 49 U.S.C. S 40101); see also H.R. Rep. No. 95-1211, at 4-5, reprinted in 1978 U.S.C.C.A.N. 3737, 3740-41. The Airline Deregulation Act was drafted to accomplish that result. See Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 (codified as amended at 49 U.S.C. SS 40101 et seq.).

To ensure that the states would not re-regulate what Congress had decided to deregulate, the Act incorporated a preemption provision. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378-79 (1992). The provision as amended reads: "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ." 49 U.S.C. S 41713(b)(1).3

In Morales, the Supreme Court concluded that preemption prevented states from barring allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes. Giving a broad interpretation to the words "relating to," the Court held that "[s]tate enforcement actions having a connection

_____

3. The original preemption section stated: "no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to
rates, routes, or services of any air carrier . . . ." 49 U.S.C. S 1305(a)(1)
(repealed) (emphasis added). The current preemption section deletes the words "rule" and "standard," and substitutes "price" for "rates." However, the legislative history of these changes shows that Congress intended no substantive change to the meaning of the preemption section. See H.R. Rep. No. 103-180, at 305, reprinted in 1994 U.S.C.C.A.N. 818, 1122; see also H.R. Conf. Rep. No. 103-677, at 83, reprinted in 1994 U.S.C.C.A.N. 1715, 1755.

with, or reference to, airline `rates, routes, or services' are pre-empted." Id. at 383-84.

The Court expressed its concern that "as an economic matter . . . state restrictions on fare advertising have the forbidden significant effect upon fares." Id. at 388. Moreover, preemption in that case would not leave a regulatory void "giv[ing] the airlines carte blanche to lie to and deceive consumers," because the federal Department of Transportation retained its authority to investigate unfair and deceptive practices. Id. at 390-91 (citing 49 U.S.C. S 1381 (recodified as 49 U.S.C. S 41712)).

Morales did not discuss common law torts, but the Court did indicate real limitations to the Act's preemptive scope, stating, "we do not, as [defendant] contends, set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines," and "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner to have pre-emptive effect." Id. at 390 (internal quotation marks omitted, other alterations in original).

The Court revisited the preemption issue in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), determining that a state's consumer fraud statute could not be applied to American's decision to devalue mileage credits accrued by users of its frequent flyer program. See id. at 227-28. The Court, however, also held that a common law breach of contract suit by program participants was not preempted because the claim simply sought to hold the parties to their agreements. See id. at 229.

Rather than involving "state-imposed obligations," these contracts involved "privately ordered obligations" and "self-imposed undertakings," which the Court doubted that Congress intended the federal Department of Transportation to adjudicate. See id. at 228-29, 232. It was also questionable whether Congress wished to "channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, . . . contract claims relating to airline rates, routes, or services." Id. at 232.

9

Wolens thus indicated that Morales was not open-ended and that preemption did not apply to all state law affecting the passenger-airline relationship. Once again, the Court did not rule on state tort law claims, but significantly, observed that the airline had not urged preemption of personal injury claims related to airplane operations. See id. at 231 n.7. Moreover, the government in its amicus curiae brief stated " `[i]t is . . . . unlikely that Section 1305(a)(1) preempts safety-related personal-injury claims relating to airline operations.' " Id. (quoting Brief for United States as Amicus Curiae 20 n.12). Even though the Wolens majority did not directly address whether common law torts were preempted, several Justices did. Justice Stevens argued that "Congress did not intend to give airlines free rein to commit negligent acts subject only to the supervision of the Department of Transportation, any more than it meant to allow airlines to breach contracts with impunity." Id. at 237 (Stevens, J., concurring in part and dissenting in part). After all, the standard of ordinary care, like contract principles, "is a general background rule against which all individuals order their affairs." Id. at 236-37.

Even Justice O'Connor, dissenting because she urged broader preemption than the majority, stated "my view of Morales does not mean that personal injury claims against airlines are always pre-empted." Id. at 242 (O'Connor, J., concurring in the judgment in part and dissenting in part). She cited with apparent approval a number of cases in the Courts of Appeals and District Courts that allowed recovery in tort cases. See id. at 242-43.

In short, the Supreme Court, although it has not yet directly addressed the preemption clause as applied to state tort claims, has strongly indicated that they would not be barred. Wolens quoted with approval the government's view of a general standard against which the issue should be considered: "[T]he ban on enacting or enforcing any law `relating to rates, routes, or services' is most sensibly read, in light of the [Act's] overarching deregulatory purpose, to mean `States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.' " Id. at 229 n.5 (quoting Brief for United States as Amicus Curiae 16).

10

Further, the interpretation of even express preemption provisions such as the one in the Act must begin with the "presumption that Congress does not intend to supplant state law." New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995). Even "where federal law is said to bar state action in fields of traditional state regulation, we have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. at 655 (citation and internal quotation marks omitted).

In the absence of definitive guidance from the Supreme Court, the Courts of Appeals have struggled with the relationship between the Act's preemption clause and state tort claims. The rulings have not been consistent, as a review of post-Morales appellate case law reveals.4

For example, in Hodges v. Delta Airlines, Inc., 44 F.3d 334 (5th Cir. 1995) (en banc), the Court of Appeals for the Fifth Circuit found a distinction between activity that was related to "services" furnished by an airline, and conduct connected with "operation and maintenance" of the aircraft. The Court reasoned that a carry-over provision of the Federal Aviation Act requiring airlines to carry insurance covering liability for personal injuries "resulting from the operation or maintenance of aircraft," 49 U.S.C. S 1371(q) (recodified as 49 U.S.C. S 41112(a)), indicated Congressional intent to exclude such claims from preemption and leave them within the scope of state common law. See Hodges, 44 F.3d at 338-39; see also Wolens, 513 U.S. at 231 n.7 (noting 49 U.S.C.S 1371(q)). On the other hand, "services" were barred from state regulation. See Hodges, 44 F.3d at 339.

In Hodges, a passenger in a plane was injured by a box

_____

4. Cases in the District Courts are more numerous and follow a similar pattern of inconsistency, including divergent results in cases involving defamation claims. Compare, e.g., Chukwu v. Board of Directors British Airways, 889 F. Supp. 12, 14 (D. Mass. 1995) (tort claims such as slander preempted), aff'd, 101 F.3d 106 (1st Cir. 1996), with Fenn v. American Airlines, Inc., 839 F. Supp. 1218, 1223-24 (S.D. Miss. 1993) (slander claim not preempted).

that fell from an overhead bin. The Court held that this claim was attributable to "operation" of the aircraft rather than "services" and hence was not preempted. See id. at 339-40. The Court conceded, however, that the two categories might often overlap. See id. at 339. The Court applied a similar dichotomy in Smith v. America West Airlines, Inc., 44 F.3d 344 (5th Cir. 1995) (en banc), holding that when an airline allowed a deranged individual to buy a ticket and board the plane, an injury claim that arose from the ensuing hijacking was not preempted. See id. at 347. The opinion suggested a distinction between the economic and safety aspects of air travel. See id. at 346-47.5

In one case, the Court of Appeals for the Ninth Circuit originally adopted an operations/services distinction in determining whether tort claims were preempted. See Gee v. Southwest Airlines, 110 F.3d 1400, 1406 (9th Cir. 1997). However, sitting en banc in Charas v. Trans World Airlines, Inc., Nos. 96-15490, 97-55115, 96-15543, 97-15158, 96-15791, 1998 WL 822116 (9th Cir. Nov. 30, 1998), the Court abandoned that approach in favor of one focused on the Congressional intent of economic deregulation of the airline industry. See id. at *1. From that standpoint, the Court believed that Congress used the word "services" in reference to the "prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail." Id. at *1.

Charas concluded that in context, "service" referred to such matters as "the frequency and scheduling of transportation," and "the selection of markets" for that activity, in short, in a "public utility sense." Id. at *7. The term was not intended to include the "provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." Id. at *1. Consequently, Congress did not intend to preempt "run-of-the-mill personal injury claims." Id.

_____

5. In Public Health Trust v. Lake Aircraft, Inc., 992 F.2d 291 (11th Cir. 1993), the Court held that personal injury claims based on aircraft design defects were not preempted. Cleveland v. Piper Aircraft Corp., 985 F.2d 1438 (10th Cir. 1993), came to the same conclusion. Both cases discussed federal regulations on aircraft design standards.

12

A somewhat different facet of preemption presented itself in Smith v. Comair, Inc., 134 F.3d 254 (4th Cir. 1998). In that case, the Court of Appeals for the Fourth Circuit held that a passenger's claims based on an airline's refusal to permit him to board were preempted. See id. at 259. The Court concluded that "boarding procedures" are "services," and that the airline's action was justified by security directives promulgated by the Federal Aviation Administration. See id. at 258-59. However, the passenger's state law claims for false imprisonment and intentional infliction of emotional distress were not preempted to the extent that they were based on activity distinct from denial of boarding because such conduct "too tenuously relates or is unnecessary to an airline's services." Id. at 259.

The Court of Appeals for the Seventh Circuit confronted another variation in Travel All Over The World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423 (7th Cir. 1996), a suit by a travel agency alleging that the defendant airline had uttered slanderous and defamatory statements. The Court held that the false statements about the plaintiff travel agency's activities did not expressly refer to "airline rates, routes, or services." See id. at 1433. Moreover, the utterances did not have the " `forbidden significant [economic] effect' on airline rates, routes, or services, as contemplated by Morales." Id. Accordingly, the defamation claim was not preempted.

The Travel All Court, however, remanded for further consideration of other intentional tort claims based in part on the airline's refusal to honor tickets purchased from the travel agency. The Court took the view that "intentional tort" claims invoke the "enactment or enforcement of a law" and are barred by the preemption clause, inasmuch as the refusal to board passengers was part of an airline's ticketing services. See id. at 1435 (internal quotation marks omitted).

As is apparent from these cases, attempts to resolve the issue of preemption in tort causes of action have been hampered by the ambiguous preemption terminology. The Supreme Court's efforts to arrive at a practical interpretation in Morales and Wolens have not resolved questions arising in the tort field.

13

To some extent, some of the Courts of Appeals may have read too much into the opinions of Morales and Wolens. In neither case did the Supreme Court decide whether state tort claims were preempted. Nor did it embrace a dichotomy between "services" and "operations."

We agree with those Courts that have found that the continued existence of statutorily mandated liability insurance coverage is strong evidence that Congress did not intend to preempt state tort claims. It would make little sense to require insurance to pay for bodily injury claims if airlines were insulated from such suits by the preemption provision. Indeed, in Wolens, the Supreme Court noted in passing the significance of the requirements for liability insurance set out in 49 U.S.C. S 1371(q) (recodified as 49 U.S.C. S 41112(a)). See Wolens, 513 U.S. at 231 n.7. Because that provision refers to "operation or maintenance of aircraft," it is understandable that some appellate opinions have seized upon an operations/services dichotomy to articulate a workable analytical framework.

Nevertheless, we do not find it conceptually helpful to distinguish "operation or maintenance of aircraft" from "service." The approach espoused by the Court of Appeals for the Ninth Circuit in Charas offers a more promising solution. It is consistent with Wolens' observation that the preemption clause was intended to prevent the states from re-regulating airline operations so that competitive market forces could function. See Charas, 1998 WL 822116, at *6. From that standpoint, the proper inquiry is whether a common law tort remedy frustrates deregulation by interfering with competition through public utility-style regulation. See id. at *7. When state law does not have a regulatory effect, it is "too tenuous, remote, or peripheral" to be preempted. Morales, 504 U.S. at 390. We consider it highly unlikely that claims caused by careening service carts and plummeting luggage were to be removed from state adjudication.

We conclude that focusing on the competitive forces of the market, rather than on a strained and unsatisfactory distinction between "services" and "operations," leads to a more accurate assessment of Congressional intent. It is highly unlikely that Congress intended to deprive

14

passengers of their common law rights to recover for death or personal injuries sustained in air crashes. Such a massive change from pre-existing policy would hardly be imposed without specific statutory language. "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured . .. ." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251 (1984).

Freeing airlines from the pervasive control over prices, routes, and services that existed previously does not require a grant of sweeping immunity from the tort liability that existed throughout the regulatory era. If immunity was not deemed necessary for the industry during its infancy, it is difficult to understand why it would be necessary once the carriers were considered strong enough to fly on their own into the competitive atmosphere.

Moreover, preemption is inappropriate in the tortfield for an eminently practical reason. As Wolens pointed out, the Department of Transportation has neither the authority nor the apparatus required to superintend contract disputes. See Wolens, 513 U.S. at 232. That observation applies equally to tort disputes. It is significant that Congress retained the savings clause of the predecessor statute, which preserved "the remedies now existing at common law or by statute." Id. at 232 (quoting 49 U.S.C. S 1506 (recodified as 49 U.S.C. S 40120(c))).6

Applying the foregoing considerations to the case before us, we hold that the plaintiff 's defamation claims are not preempted and may, therefore, proceed. Application of state law in these circumstances does not frustrate Congressional intent, nor does it impose a state utility-like regulation on the airlines. We therefore conclude that the plaintiff's suit is simply "too tenuous, remote, or peripheral" to be subject to preemption, even though Delta's statements refer to ticketing, arguably a "service."

_____

6. The savings clause has been amended and recodified, and now states that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. S 40120(c). The legislative history states that
the new language was "substituted for 49 App.:1506 to eliminate unnecessary words and for clarity and consistency in the revised title and with other titles of the United States Code." H.R. Rep. No. 103-180, at 276, reprinted in 1994 U.S.C.C.A.N. 818, 1093.

Taj Mahal also asserts a claim for punitive damages. The Travel All Court thought that such an award, which "represents an `enlargement or enhancement[of the bargain] based on state laws or policies external to the agreement,' " might be preempted, "provided that it relates to airline rates, routes or services." 73 F.3d at 1432 n.8 (quoting Wolens, 513 U.S. at 233 & n.8). 7

We are not persuaded by that reasoning, however, because defamation is so foreign to regulations on prices, routes, and services that it is unlikely that an award of traditional damages would offend Congressional intent. As the Court remarked in Silkwood, "[p]unitive damages have long been a part of traditional state tort law" and it was the defendant's "burden to show that Congress intended to preclude such awards." 464 U.S. at 255. Because the defamation claims are not preempted, we conclude that customary remedies, including punitive damages, if warranted, survive as well.

Accordingly, the judgment of the District Court will be reversed and the matter remanded for further proceedings consistent with this opinion.

_____

7. In West v. Northwest Airlines, Inc., 995 F.2d 148, 152 (9th Cir. 1993), the Court held that compensatory, but not punitive, damages could be received by a passenger who had been "bumped from an overbooked flight."

GARTH, Circuit Judge, dissenting:

I approach the two issues in this case in reverse. See, e.g., Smith v. Comair, Inc., 134 F.3d 254 (4th Cir. 1998). That is, first, I agree with the holding of this Court that the ADA does not preempt a state-law cause of action for defamation. However, in reaching the merits of Taj Mahal's claim, I cannot agree that the facts giving rise to Taj Mahal's cause of action warrant a reversal of the judgment of the District Court in favor of Delta. Because I cannot conclude that the letter sent by Delta can reasonably be determined to be defamatory of Taj Mahal, I dissent.

The majority (Majority Op. at 6), focusses on the following highlighted language in the letter, reproduced here in its entirety:

> We regretfully inform you that the ticket presented has been reported as a stolen airline ticket.
>
> It is unfortunate that you have purchased one of these tickets. While we empathize with your predicament, we cannot honor this ticket for transportation because Delta has not yet received the money you paid. To assist you in this difficult situation, we will sell you a new ticket, honoring the fare indicated in yourflight reservation record and waiving any advance purchase requirements.
>
> It is necessary to retain your ticket in order to assist with the ongoing law enforcement investigation; however, this letter will serve as your receipt for ticket number [____]. If you purchased your ticket from an authorized Delta travel agency, please complete the attached affidavit and forward it to Delta Air Lines, Inc. for a refund. If you purchased the ticket from someone not authorized by Delta to sell its tickets, you should contact the individual from whom you purchased the ticket, as Delta has not received any payment for this ticket.
>
> If this ticket has been issued by a travel agent and you have further questions, you may contact the Agency Audit and Fraud Prevention, Airline Reporting Corporation at (713) 816-8134.

17

The majority analyzes those highlighted portions. Majority Op. at 6-7. In doing so, it makes two assumptions in its defamation analysis that are unwarranted by the record. First, the majority finds that the highlighted language "links theft, a criminal offense, to the ticket received from Taj Mahal" and, second, that Delta's letter "emphasized to the reader that some type of criminal misappropriation is involved." Majority Op. at 6.

The preliminary question for the trial court is whether the words at issue are capable of a defamatory meaning. Hill v. Evening News Co., 715 A.2d 999 (N.J. Super. App. Div. 1998); Scelfo v. Rutgers Univ., 282 A.2d 445 (N.J. Super. Law Div. 1971). A defamatory statement is "one that is false and `injurious to the reputation of another' . . . or subjects another person to a `loss of the good will and confidence' in which he or she is held by others." Higgins v. Pascack Valley Hosp., 704 A.2d 988, 1002 (N.J. Super. App. Div. 1998). If the statement is not capable of a defamatory meaning, the trial court should dismiss the action as a matter of law. Id. See also Moldea v. New York Times Co., 15 F.3d 1137, 1142 (D.C. Cir.), cert. denied, 513 U.S. 875 (1994) ("It is only when a court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule, as a matter of law, that it was not libelous") (internal quotations and citation omitted).

In determining whether a statement is defamatory, courts should give the statement its "fair and natural" meaning that a person of ordinary intelligence and sensibility would give it. Ward v. Zelikovsky, 643 A.2d 972, 978 (N.J. 1994). In particular, the court should consider the context in which the allegedly defamatory statements were made. Molin v. Trentonian, 687 A.2d 1022, 1023 (N.J. Super. App. Div.), certif. denied, 704 A.2d 20 (1997), cert. denied, 119 S. Ct. 239 (1998). See also Ward, 643 A.2d at 980.

The Delta letter does not rise to the level of attributing criminal conduct to Taj Mahal or to any other party. The letter merely states that the passenger's ticket was "reported" as stolen, and states there is an "ongoing law enforcement investigation" underway. Even if the letter

18

could be read as raising a specter of "some type of criminal misappropriation," the text does not fall within the types of statements found by New Jersey courts to be assertions of criminal wrongdoing. This is not, for example, a situation in which the publication stated that the plaintiff "may be" charged with criminal activity. See Lawrence v. Bauer Pub. & Printing Ltd., 446 A.2d 469 (N.J.), cert. denied, 459 U.S. 999 (1982). Nor is this a situation in which the plaintiff is named as taking an action that could be considered indicative of guilt. See Molnar v. Star-Ledger, 471 A.2d 1209 (N.J. Super. App. Div. 1984) (finding article stating plaintiff refused to take lie detector test in arson investigation of his building defamatory). Rather, the Delta letter represents an attempt to gather information and does not impute criminal activity to any party.

Even when there is a clear imputation of criminal activity, unlike the case here, courts have upheld summary judgment for a defendant. See, e.g., Molin, 687 A.2d at 1024 (finding no defamation in publishing story about alleged stalker when headline indicated plaintiff had been arrested; body of story indicated plaintiff had only been charged with stalking and not yet convicted). Here, the circumstances are much more tenuous than in Molin. Taj Mahal is not imputed to have been charged with criminal conduct, or even that it will be charged. The reference to an "ongoing investigation" is enough, on a reasonable reading, to conclude that no one has been charged with any crime as yet, or even that no crime has been committed.

The majority's conclusion that the letter accuses someone of having stolen the tickets is incorrect. Were that the case, it is unlikely that Delta would advise passengers who received the letter to contact the person from whom they purchased the ticket. The letter itself states that if a passenger "purchased the ticket from someone not authorized by Delta to sell its tickets, [the passenger] should contact the individual from whom you purchased the ticket." Read in context, the letter indicates only what it says: Delta has questions about the ticket presented, and the passenger should contact the party from whom he bought the ticket for information or a refund.

19

Nor do the statements in the letter rise to the level of the facts of cases that have found statements of sufficient ambiguity to send the determination of meaning to a jury. See, e.g., St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309 (3d Cir. 1994) (reversing summary judgment for defendant newspaper when article stated that criminal charges would be filed against plaintiff "next week"); Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1082-83 (3d Cir. 1988) (finding magazine report of name found in files relating to "sting" operation susceptible of non-defamatory meaning, and reversing lower court's holding of defamation per se); Biondi v. Nassimos, 692 A.2d 103 (N.J. Super. App. Div. 1997) (finding statement in public meeting that plaintiff had "mob connection" and was going to order a "hit" on defendant not defamatory as matter of law and susceptible to non-defamatory meaning).

The letter issued by Delta contains no connections between Taj Mahal and any possible wrongdoing sufficient to make the statements ambiguous. When a passenger received a letter, the passenger may have first wondered whether Taj Mahal was an authorized or non-authorized agent of Delta. Assuming (as the majority does, Majority Op. at 7 n.2), a customer was ignorant of that fact, the next likely step would be to call and ask Taj Mahal for an explanation, which is exactly what the letter instructs.

These actions, although inspired by the statements contained in the letter, do not make the statements "false and `injurious to the reputation of another' . . . or subject[ ] another person to a `loss of the good will and confidence' in which he or she is held by others.' " Higgins, 704 A.2d at 1002 (finding no defamation in employer's letter to plaintiff stating it found no substance to plaintiff's accusations about another employee).

The District Court was correct in holding the letter was not reasonably susceptible to a defamatory meaning and did not "state, suggest or imply that the plaintiff was a thief." Therefore, I would affirm the decision of the District Court granting Delta's motion to dismiss Taj Mahal's complaint.

My disagreement with the majority's analysis involves still another aspect of Taj Mahal's claim pertaining to its

20

action for defamation. An indispensable prerequisite for a defamation action is that the alleged defamatory statement be "of and concerning" the plaintiff. Durski v. Chaneles, 419 A.2d 1134, 1135 (N.J. Super. App. Div. 1980) (citing Gnapinsky v. Goldyn, 128 A.2d 697 (N.J. 1957)). A party claiming to have been defamed must show either that the statement referred specifically to it, or that someone familiar with the statement reasonably believed that the party was in fact intended; proof may be by extrinsic circumstances. Scelfo, 282 A.2d at 448. Because the Delta letter does not satisfy the threshold standard, i.e. that the letter is capable of a defamatory meaning, it cannot as a matter of law be deemed defamatory. Hence, I do not reach the issue of whether the letter is "of and concerning" Taj Mahal.

Because I would affirm the District Court's judgment in favor of Delta, but the majority has reversed that judgment, I respectfully dissent.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

21